UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61719-CIV-DIMITROULEAS/SNOW

MARIA TERESA ROGET,

  Plaintiff,

  vs.

ILOLO KIJAKZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

  Defendant.

_____/

## REPORT AND RECOMMENDATION

  This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits.  The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation.

## I. PROCEDURAL HISTORY

  The Plaintiff filed an application for disability benefits on March 15, 2018, alleging disability since February 12, 2018 as a result of fibromyalgia, migraines, back and knee pain and mental impairments.  The application was denied initially and upon reconsideration.  The Plaintiff then requested a hearing, which was held before Administrative Law Judge Valencia Jarvis on August 21, 2019.  The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the Plaintiff's request for review on

June 26, 2020. The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on February 27, 1977 and has a high school education. Her past relevant work was as a sales clerk and retail demonstrator. The Plaintiff has not worked or looked for work since February 2018. (R: 147-52)

The medical record reflects that on March 5, 2018, the Plaintiff presented to Antoinette Shorter, M.D. at Memorial Healthcare in Miramar, Florida, stating that she had suffered from a headache for 3 days. The Plaintiff was scheduled for a Botox injection on March 22, 2018. She reported that she had been under pressure from family issues and loss of her job. The Plaintiff requested an injection of Toradol, which had been helpful to her in the past. Her medications included Flexeril, Fioricet, Elavil, Percocet and Lyrica. Dr. Shorter's physical examination of the Plaintiff yielded normal results and an MRI of the Plaintiff's brain was essentially normal. The doctor diagnosed chronic tension-type headache and intractable migraine. She prescribed Flexeril and administered the Toradol injection. A Botox injection was administered to the Plaintiff by Maike T. Blaya, M.D. on March 16, 2018. (R:741-41, 988-93)

On April 4, 2018, the Plaintiff presented for follow-up to Felix Ramirez, D.O., a pain specialist, complaining of pain involving the entire axial spine, primarily in the low back. The Plaintiff rated the pain as 9 on a scale of 10, stating that it interfered with her activities of daily living. She reported no side effects from any of her multiple medications. The Plaintiff stated that she had symptoms of depression. Dr. Ramirez' examination of the Plaintiff's cervical and lumbar spine revealed paravertebral tenderness bilaterally, limited range of motion, 4/5 motor strength and normal sensation. Straight leg raising was negative bilaterally. Dr. Ramirez' assessments

were lumbago; lumbar disc displacement without myelopathy; long term current use of opiate analgesic; lumbar facet joint syndrome; encounter for therapeutic drug level monitoring and fibromyalgia.  The doctor refilled the Plaintiff's prescriptions for Percocet and Lyrica.  (R:749-52)

On April 26, 2018, the Plaintiff presented to Carla Brutus, ARNP at Memorial Healthcare, for treatment of headache and ear pain.  The Plaintiff complained that none of her doctors were helping her: one doctor said there was nothing wrong with her, rheumatology would only give her a muscle relaxer which she already was taking and her pain management doctor would not even see her.  She requested a Toradol injection but declined it when offered because the dose was insufficient to help with her pain.[1]  (R:995-86)

Ms. Brutus' physical examination of the Plaintiff revealed tenderness through muscle, thoracic and lumbar regions, with limited range of motion in the lumbar column and positive straight leg raising in the supine position.  However, the Plaintiff had normal range of motion in her shoulders and knees.  Ms. Brutus noted that the Plaintiff did not move her neck during the examination, but moved only her eyes.  Ms. Brutus also noted that an MRI of the Plaintiff's brain performed in February 2018 was essentially normal except for indication of sinus disease.  Ms. Brutus prescribed Benadryl for the Plaintiff's ear pain and discontinued loratadine, while continuing the Plaintiff's other medications.  (R:839-41, 997-1001)

On May 7, 2018, a consultative psychological evaluation of the Plaintiff was performed by Maxine A. Sadhai, Psy.D.  The Plaintiff told Dr. Sadhai that she suffered from depression and panic disorders, but had no history of psychological treatment.

---

[1] On May 17, 2018, Ms. Brutus noted, "She is requesting 60 mg of Toradol for pain and repeats on numerous occasions that 60 mg is what she needs to treat her pain."  (R:1003)

The Plaintiff related that she was not currently receiving any mental health treatment, but in the past a psychiatrist had provided medication and therapy. The Plaintiff expressed anger because she has sought treatment for physical problems at Memorial Hospital but repeatedly was referred to behavioral health. She noted that her doctor had failed to diagnose an ear infection, which had resulted in hearing loss. The Plaintiff stated that she had a history of suicide attempts and suicidal ideation, the last being 10 years earlier. She listed the multiple medications she was taking, but denied alcohol or substance abuse. (R:787-88)

Mental status examination revealed that the Plaintiff was friendly, polite and cooperative; speech was logical and goal-oriented, with normal tone; mood was anxious and depressed, with congruent affect and limited range of emotions, and thought content was reality oriented and focused on describing her psychological and medical problems. The Plaintiff was oriented in all spheres. Her immediate memory was borderline and concentration was poor. Recent and remote memory were intact. The Plaintiff's fund of information, ability to perform mental calculation, abstract reasoning, judgment and social cognition all were borderline, and insight was moderate. (R:787-89)

Dr. Sadhai diagnosed Major Depressive Disorder, Severe and Panic Disorder, with a moderate prognosis. The doctor found that the Plaintiff was able to meet most activities of daily living and her social functioning was moderate to good. In the area of concentration and persistence, Dr. Sadhai noted that the Plaintiff had applied herself to all tasks and placed a full amount of effort into the evaluation. In the area of deterioration or decompensation in the work setting, the doctor noted that the Plaintiff had worked for 5 years at her last job as a product demonstrator prior to being laid off. (R:789-90)

4

On May 11, 2018, a Mental Residual Functional Capacity Assessment of the Plaintiff was performed by Cristina Grand, Psy.D., a state agency non-examining psychologist. Dr. Grand opined that the Plaintiff did not have understanding or memory limitations. In the area of sustained concentration and persistence, the Plaintiff was not significantly limited in the abilities to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. However, she was moderately limited in the abilities to carry out detailed instructions and to maintain attention and concentration for extended periods. Dr. Grand stated that the Plaintiff had a moderate impairment with completion of detailed instructions and the ability to pay attention and concentrate for extended periods of time. In the areas of social interaction and adaptation, Dr. Grand opined that the Plaintiff had no significant limitations. Dr. Grand stated that the Plaintiff was able to understand, remember and carry out simple instructions.(R:212-13)

On May 25, 2018, the Plaintiff presented to Maike T. Blaya, M.D., a neurologist, for follow-up on the Plaintiff's complaints of headache and chronic pain. Dr. Blaya noted that the Plaintiff had poor coping abilities. The Plaintiff reported that she continued to have frequent headaches, but had noticed some improvement from Botox treatments. She stated that her depression had been more stable and she was coping better with her chronic pain. She was continuing pain management with daily use of Percocet. The Plaintiff was not receiving psychiatric treatment, but requested

something for her anxiety.   Dr. Blaya's neurological examination yielded normal results. (R:834, 836-37)

Dr. Blaya concluded with the following remarks:

I had a long discussion with the patient and her mother.
I told her I am very happy to see her doing so well.  However she suffers from depression and has had a diagnosis of bipolar disorder.  This is a mental disorder and this is a chronic condition.   SHE NEEDS TO CONTINUE TO FOLLOW W PSYCHIATRY.  Another reason to follow w psychiatry is the fact that she has chronic pain and uses narcotics to control it.

I am willing to try to help her w her anxiety TEMPORARILY until she sees a psychiatrist.  I will provide w medications for 3 months.
I don't feel comfortable prescribing Benzodiazepines because she is on other CNS depressors, specially narcotics.
Will prescribe Buspirone, an anxiolytic, non-benzodiazepine.

(R:837) (emphasis in original)

On June 20, 2018, a consultative physical examination of the Plaintiff was performed by Pierre Richard Edouard, M.D.   The Plaintiff described her various physical complaints, and reported depression and anxiety symptoms, but stated that she had not seen a psychiatrist for the preceding 9 years. Physical examination of the Plaintiff yielded normal results except for tenderness in the lumbar spine, shoulder, knees and neck.  The Plaintiff's grip strength was 5/5 in both hands and both legs, with normal fine manipulation and normal range of motion throughout.  However, supine and seated straight leg raise tests showed pain at 60 degrees bilaterally.  The Plaintiff had a normal gait and was able to toe and heel walk. Neurological examination was normal and the Plaintiff showed good memory and judgment.  (R:843-49)

On June 26, 2018, the Plaintiff returned to Ms. Brutus with complaints of abdominal pain.   She told Ms. Brutus that she was receiving rheumatological treatment for fibromyalgia, with her last  appointment one year earlier.  The Plaintiff had no muscle aches or joint pain, and although she complained of stress from caring

for 3 family members, she had not established care with psychiatry for depression or anxiety. Review of systems was negative for ear pain, joint pain, myalgias, dizziness or headaches. Ms. Brutus noted that the Plaintiff's migraines and fibromyalgia were currently stable and controlled with her treatment plan, while depression, anxiety and abdominal pain were currently uncontrolled or worsened. Ms. Brutus discontinued Benadryl, ciprofloxacin-hydrocortisone and mupirocin, and started omeprazole (Priolosec) for gastric complaints. The Plaintiff's other medications were continued. (R:1010-17)

On July 12, 2018 Dr. Edouard completed a Fibromyalgia Report pertaining to the Plaintiff which indicated that the Plaintiff had 14 of 18 tender points, with the minimum of 11 required for a fibromyalgia diagnosis. (R:1019)

On July 16, 2018, Steven Weinschel, M.D., a state agency non-examining physician completed a Physical Residual Functional Capacity Assessment of the Plaintiff. Dr. Weinschel opined that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently and could stand/walk or sit for about 6 hours during an 8-hour workday. She had an unlimited ability to push and/or pull and operate hand and foot controls, within light/carry restrictions. The Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. The same findings were made by another state agency non-examining physician, Richard Lewis, M.D. on October 18, 2018. (R: 211-212, 226-27)

On September 24, 2018, an Outpatient Behavior Health Admission Protocol completed at Memorial Healthcare indicated that the Plaintiff had no more than slight impairment in social, occupational or school functioning. (R:1324)

On October 17, 2018, a Mental Residual Functional Capacity Assessment of the Plaintiff was performed by Keith Bauer, Ph.D., a state agency non-examining

psychologist.  Dr. Bauer determined that the Plaintiff did not have understanding or memory limitations, as she could understand and remember moderately complex instructions.  In the area of sustained concentration and persistence, the Plaintiff was not significantly limited in the abilities to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions.  However, she was moderately limited in the abilities to carry out detailed instructions; maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Bauer stated that the Plaintiff could persist at simple and routine tasks for a regular workday at an appropriate pace and could sustain at this level over an extended period of time.  (R:228)

In the area of social interaction, Dr. Bauer opined that the Plaintiff was not significantly limited in the abilities to ask simple questions or request assistance and to maintain socially appropriate behavior and to adhere to the basic standards of neatness and cleanliness. The Plaintiff was moderately limited in the abilities to interact appropriately with the general public; accept instructions and respond appropriately to criticisms from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavior extremes.  Dr. Bauer opined that the Plaintiff would work best in an environment in which she had limited contact with the public and limited interpersonal demands.  The doctor did not believe that the Plaintiff had any adaption limitations, stating that she could adapt to most changes and task demands found in a routine work setting.  (R:228-29)

On the same date, Dr. Bauer completed a Psychiatric Review Technique assessment of the Plaintiff. Dr. Bauer opined that the Plaintiff had mild limitations in the ability to understand, remember or apply information; moderate limitations in the ability to interact with others; moderate limitations in the ability to concentrate, persist or maintain pace, and mild limitations in the ability to adapt or manage herself. Dr. Bauer noted that the Plaintiff had a diagnostic history of polysubstance abuse (alcohol, cocaine and cannabis), bipolar disorder and borderline personality disorder. (R:224-25)

On January 11, 2019, the Plaintiff was evaluated for medication management by Sathi Ghosh, M.D. at Memorial Behavioral Health in Hollywood, Florida. She reported doing well on her current medications, which included Elavil, Buspar and Lexapro, as well as Fioricet, Zofran, MS Contin, Flexeril and Lyrica. The Plaintiff stated that she was attending classes to become a nurse and cooked food for her family and boyfriend, but felt anxious over family situations. She had fair sleep and appetite. The Plaintiff denied illicit drug use and stated that she only drank socially. Mental status examination revealed that the Plaintiff was cooperative and fully oriented, with appropriate attention and speech. She had an anxious affect, with logical and coherent thought. Fund of knowledge, short term memory and judgment were intact, and insight was full. Dr. Ghosh's encounter diagnosis was moderate episode of recurrent major depressive disorder and generalized anxiety disorder. He continued the Plaintiff on Elavil and Lexapro and increased her dosage of Buspar. (R:1340-43)

On January 29, 2019, the Plaintiff returned to her neurologist, Dr. Blaya, reporting significant improvement with use of Aimovig. Dr. Blaya noted a diagnosis of chronic migraines with medication overuse. Continued use of Aimovig was not approved by the Plaintiff's insurance. (R:1580-83)

On March 18, 2019, the Plaintiff presented to Elkin Fabian Bejarano, M.D. at Memorial Healthcare with complaints of jaw pain and swelling. Dr. Bejarano noted that a dentist had not found any dental pathology. Review of systems was negative for abdominal pain, flank pain, myalgias, dizziness, weakness or headaches. The doctor observed that the Plaintiff's gait and coordination were normal. He prescribed antibiotics for the Plaintiff's jaw complaints and adjusted the dosage of indomethacin (Indocin). Other medications were continued. (R:1035-41)

On April 3, 2019, the Plaintiff returned to Ms. Brutus, complaining of joint and muscle pain, fatigue and stress. The Plaintiff stated that she was the caretaker for 3 family members and was experiencing an inability to concentrate and problems with short term memory, which she attributed to stress. Ms. Brutus advised the Plaintiff to discuss these symptoms with her psychiatrist. Ms. Brutus also noted that the Plaintiff was under pain management care and that the Plaintiff reported improvement in her migraine headache pain, and stated that her joint pain was controlled with MS Contin (morphine) and muscle relaxer. Physical examination yielded normal results. (R:1044-46)

Ms. Brutus noted that the Plaintiff's conditions of left upper quadrant abdominal pain; chronic pain syndrome; fibromyalgia; generalized anxiety disorder; multiple joint pain; family history of breast cancer; chronic migraine; moderate episode of recurrent major depressive disorder, and long term (current) use of opiate analgesic all were currently stable and controlled with current treatment plan. Only female pelvic pain was currently uncontrolled or worsened, but no diagnostic tests were needed and the Plaintiff was to follow up with her gynecologist. Ms. Brutus discontinued the Plaintiff's vitamin D, mupirocin, diazepam and sumatriptan, but continued other medications. The Plaintiff was to return in 5 months. (R:1047-50)

On May 16, 2019, the Plaintiff again presented to Ms. Brutus, complaining of pain and instability in her left knee. The Plaintiff stated that the pain was aggravated by walking, and she had been unable to perform knee exercises or participate in yoga classes. Physical examination revealed decreased range of motion and medial joint line tenderness in the Plaintiff's left knee, with no swelling, effusion, ecchymosis or erythema. Ms. Brutus observed crepitus in both of the Plaintiff's knees, worse on the left. Ms. Brutus ordered an MRI of the Plaintiff's left knee and referred her to an orthopedist. (R:1051-56)

On June 5, 2019, the Plaintiff was evaluated for right-sided jaw pain by Jessica Amelia Porter, M.D. Musculoskeletal examination revealed no edema. Dr. Porter recommended a course of antibiotics. Musculoskeletal examination on the same date by Michael Robert Remaly, D.O. revealed normal range of motion. On June 6, 2019, examination by Javed Firoz Patika, D.O. indicated that the Plaintiff was able to move all of her extremities with no pain, and on June 7, 2019, Dr. Porter made the same finding. (R: 1076, 1086,1106, 1110-12)

On June 20, 2019, the Plaintiff presented to Alex Fokin, Jr., M.D., an orthopedic surgeon. The Plaintiff told Dr. Fokin that her knee pain had begun 4-5 months earlier and had gotten progressively worse. The pain, which the Plaintiff rated as a 6 out of 10, was a dull, throbbing ache, mostly around the medial joint line. She denied any knee instability, but reported intermittent clicking and catching, as well as intermittent swelling. Physical examination of the Plaintiff's left knee revealed mild knee effusion; McMurray's test positive medially; tenderness to palpation over the medial joint line and the patella anteriorly, and intact sensation. The Plaintiff could perform a straight leg raise, and extension and flexion were 5/5. In full extension, there was grade 1+ medial grade and grade 1+ lateral quadrant patella glide, with no

significant patella glide at 20-30 degrees of flexion.  Knee range of motion was 0 - 135 degrees, with no extensor lag or flexion contractures.  (R:1611-16)

X-rays of the left knee were normal, but Dr. Fokin believed that the Plaintiff was exhibiting symptoms of patellofemoral syndrome and acute medial meniscus tear.  He ordered an MRI of the left knee to ascertain if there was a tear.  Dr. Fokin discussed exercises which the Plaintiff could perform, as well as the availability of intra-articular corticosteroid injections.  The doctor informed the Plaintiff that if pain and mechanical symptoms persisted, she likely would be a candidate for surgery.  (R:1617)

On July 10, 2019, the Plaintiff was evaluated by Kenneth Kehn-Yao Poon, M.D. at Memorial Healthcare's Division of Infectious Disease for follow-up on her jaw pain.  On musculoskeletal examination there was no evidence of edema or deformity.  Neurological examination showed normal muscle tone and gait.  The Plaintiff also had normal range of motion in her neck.  (R:1669)

The Plaintiff  testified at the administrative hearing that her most recent two jobs as a pet food product demonstrator required her to be on her feet all day and to lift up to 45 pounds.  Before that, the Plaintiff worked as a sales associate at Victoria Secret, where she also was on her feet all day and sometimes had to lift boxes weighing 50 or 60 pounds.  She stated that she stopped working in February 2018 as the result of headaches, body pain and depression.  (R:148-53)

The Plaintiff testified that her fibromyalgia caused constant pain in her shoulders, wrists, lower back, knees, ankles and arms.  The Plaintiff listed her medications as morphine (30 mg 3 times per day); Wellbutrin (300 mg and 150 mg); Lexapro (20 mg); Buspar (30 mg); Fioricet; Immitrext (100 mg), and Indomethacin (50 mg).  The Plaintiff also received Botox injections in her head, shoulders and back and took Elavil at night.  She stated that the headaches, which she had 3 to 5 times per

day, required her to lie down in the dark and take her medications.  The headaches were getting worse despite the Botox injections because of ear and sinus infections the Plaintiff had experienced.  The Plaintiff also experienced jaw pain and pain in both knees, despite the fact that the right meniscus tear had been repaired.  (R:153-56)

The Plaintiff testified that she could stand and walk for 5 or 10 minutes during an 8-hour day.  She could not do anything around the house and could not even go to the bathroom without help from her boyfriend.  She could not hold anything and as a result could not get her own medications.  The Plaintiff stated that she also had tendinitis in her left arm, causing pain which radiated down her back.  (R:154-58)

As to her depression and anxiety, the Plaintiff stated that her treatment consisted of medication provided by Memorial Healthcare every 3 months.  She was unable to drive because she could not concentrate and because of ADD caused by her medications.  The Plaintiff related that she had been hospitalized a few times for pain and headaches.  She stated that nothing could help her pain because it persisted with the 90 mg of morphine per day she was taking, the highest amount of the drug she could get.  (F:159-61)

In response to questioning by the ALJ, the Plaintiff testified that her care givers were working on reducing the amount of narcotic medications she was taking for her headaches.  Prior to the hearing, the Plaintiff had taken her Fioricet, Indomethacin, Lyrica, morphine, Buspar, two Wellbutrin doses and Lexapro.  Her boyfriend, who is disabled, drove her to the hearing.  The Plaintiff also was being treated for jaw and knee problems.  Both knees were hurting her, but she was not sure which was getting the most medical attention.  She testified that an MRI recently had been performed on her left knee, but she did not yet have the results.  (R:164-71)

Ileana Chapman, a vocational expert (VE) was asked to consider a hypothetical individual of the same age, education and previous work experience as the Plaintiff, who could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk or sit for 6 hours during an 8-hour workday; perform unlimited pushing and pulling; could understand, remember and carry out short, simple work instructions, and have occasional interactions with the public.  The VE testified that such an individual could not perform the Plaintiff's past relevant jobs as sales clerk and demonstrator because these positions required frequent contact with the public and were semiskilled.  However, such a person could perform the jobs of merchandise marker, dishwasher, laundry worker and hotel housekeeper.  These jobs were at the light or medium exertional level and exist in significant numbers in the national economy.  (R:172-73)

In response to questions posed by counsel for the Plaintiff, the VE testified that if the same individual were limited to lifting 10 pounds occasionally; could occasionally kneel, crouch, crawl and stoop, and occasionally reach overhead and push/pull; could perform work with only simple, routine, repetitive tasks and job instructions, and could only occasionally interact with the public and coworkers, that person could perform specific sedentary jobs.  However, if that person would be off task 15% or more of the time because of headaches, no jobs would be available.  (R:174-75)

## III. <u>DECISION OF THE ALJ</u>

The ALJ first found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2022; had not engaged in substantial gainful activity since February 12, 2018, her alleged onset date; had severe impairments of Fibromyalgia, Migraines (not intractable), Spinal Disorder, Depression/Bipolar

14

Disorder, Anxiety and Substance Abuse, but did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted that there is no listing section specific to the evaluation of migraine headaches, and found that the Plaintiff's impairment did not medically equal the criteria of any listing section in Neurological, section 11.00, et seq. (R: 13-14)

Next, the ALJ determined that the Plaintiff retained the residual functional capacity to lift and carry 50 pounds occasionally and 15 pounds frequently; stand/walk for 6 hours in an 8-hour day, and perform unlimited pushing and pulling. The Plaintiff was able to understand, remember and carry out short, simple work instructions and have occasional interaction with the public. After summarizing the Plaintiff's hearing testimony, the ALJ found, after consideration of the Plaintiff's documentary and oral statements throughout the record, that the objective medical evidence failed to substantiate the Plaintiff's assertions. The ALJ stated that although the Plaintiff's medically determinable impairments reasonably could be expected to cause some of the alleged symptoms and limitations, the magnitude of the pain and the extent of those symptoms and limitations to which the Plaintiff attested were not supported by medically acceptable clinical and diagnostic techniques. Moreover, there was insufficient objective medical evidence that the Plaintiff's medical impairments were of such severity that they reasonably could be expected to give rise to the alleged level of pain and functional limitations. (R:16-17)

The ALJ acknowledged that the Plaintiff's medical records were replete with her complaints regarding headaches, but found that the objective evidence was generally unconvincing. The MRI of the Plaintiff's brain was unremarkable except for an indication of sinus disease. In March 2018, the Plaintiff stated that Botox injections

brought some relief and Toradol injections had been helpful in the past. Additionally, the Plaintiff attributed her symptoms to external stressors, including family issues and job loss. At that time, the Plaintiff denied experiencing any dizziness, tingling, tremors, sensory change, speech change, focal weakness, seizures or loss of consciousness, and neurological examination showed that the Plaintiff retained normal reflexes, gait and coordination. (R:18)

The ALJ stated that subsequent records were similarly unpersuasive, despite a litany of subjective complaints. On April 26, 2018, medical records suggested limited range of motion in the Plaintiff's lumbar column, but normal range of motion in her shoulders and knees. The Plaintiff requested a Toradol injection, but refused the offered dosage, and other records reflected that the Plaintiff had stated repeatedly that she required 60 mg of Toradol. The ALJ inferred from these records that the Plaintiff expected certain treatment despite what her treating sources recommended. Id.

The ALJ pointed out that treatment notes from May 17, 2018 revealed that the Plaintiff was in no distress and there were no remarkable musculoskeletal or neurological findings. The Plaintiff reported improvement with the Botox injections and that she was coping better with chronic pain, and Dr. Blaya noted that she was happy to see the Plaintiff doing so well. Similarly, the results of Dr. Edouard's consultative physical examination of the Plaintiff did not support the Plaintiff's subjective complaints. Although Dr. Edouard did confirm the Plaintiff's diagnosis of fibromyalgia, the ALJ pointed out that the mere diagnosis of a severe impairment such as fibromyalgia does not automatically equate to a finding of disability. The ALJ noted that on June 26, 2018, three weeks prior to Dr. Edouard's fibromyalgia diagnosis, the Plaintiff reported that she was negative for joint pain, myalgias and headaches. (R:18-19)

The ALJ observed that while the Plaintiff's various subjective complaints had persisted, objective findings remained consistently unconvincing.  On October 3, 2018, the Plaintiff complained of left knee pain, but examination revealed normal gait and normal range of motion in that knee, with no swelling.  On March 18, 2019, the Plaintiff's gait and coordination again were normal, and on April 3, 2019 the Plaintiff reported that her migraines had improved and her pain was controlled with MS contin and muscle relaxer.  Treatment notes reflected that the Plaintiff's pain syndrome, fibromyalgia, joint pains, migraines, depression and anxiety were currently stable and controlled.  (R:19)

The ALJ noted that the Plaintiff again complained of left knee pain on May 16, 2019, and examination revealed decreased range of motion, but there was no swelling, effusion, ecchymosis or erythema.  On June 5, 2019, the Plaintiff had no edema and exhibited normal range of motion throughout her musculoskeletal system, with similar findings on June 6, June 7 and July 10, 2019.  The ALJ also made reference to records from August 2019 contained in Ex. 23F, which is not included in the transcripts filed with this Court. (R:20)

The ALJ found the opinions of the non-examining state agency physicians regarding the Plaintiff's residual functional capacity to be highly persuasive because they were supported by, and consistent with, the medical evidence of record.  The ALJ noted that while the medical record confirmed the Plaintiff's attempts at treatment, the findings those records contained were based primarily on the Plaintiff's subjective complaints of pain and physical limitation.  The ALJ also pointed out that the record suggested that some of the Plaintiff's difficulties were related to her persistent, if not excessive use of medications, which called into question the efficacy of the Plaintiff's approach to treatment.  (R:20-21)

17

The ALJ also found that there were few objective medical findings in the record to support a determination of disability based on the Plaintiff's mental impairments. The ALJ noted that on January 11, April 8 and May 17, 2019, the Plaintiff reported that she was doing well on her medications and was attending nursing classes. Additionally, the Plaintiff attributed her mental symptoms to external stressors. The ALJ found the opinions of the state agency consultants to be persuasive, to the extent they were consistent with the ALJ's residual functional capacity assessment of the Plaintiff. (R:22-23)

Based on the testimony of the VE, the ALJ determined that the Plaintiff was unable to perform her past relevant work, but could perform the jobs of merchandise marker, dishwasher, laundry worker and hotel housekeeper, which exist in significant numbers in the national economy. Therefore, the ALJ concluded that the Plaintiff was not disabled for purposes of the Social Security Act.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff seeks reversal or remand on the grounds that the ALJ erred by failing to: (1) apply the correct legal standards to Dr. Bauer's opinion; (2) apply the correct legal standards and make findings pertaining to the Plaintiff's left knee impairment; (3) follow the dictates of SSR 12-2p when evaluating the Plaintiff's fibromyalgia; (4) consider SSR 19-40 when evaluating the Plaintiff's migraine headaches, and (5) admit and exhibit all of the Plaintiff's medical evidence.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence.  "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence."  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983).  The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520.  First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second, the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful

work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

A. <u>Evaluation of Dr. Bauer's Opinion</u>

The Plaintiff first argues that the ALJ erred by failing to discuss and include in her residual functional capacity assessment of the Plaintiff Dr. Bauer's opinion that the Plaintiff would work best in an environment in which she had limited interpersonal demands.  The Commissioner responds by noting that the ALJ discussed in her opinion numerous examples of the Plaintiff's ability to get along with others, and pointing out that the ALJ found Dr. Bauer's opinion to be persuasive to the extent it was consistent with the ALJ's residual functional capacity assessment.

For claims filed after March 27, 2017, 20 C.F.R. § 1520c(a) provides that no deference or specific evidentiary weight, including controlling weight, is to be given to any medical opinion or prior administrative finding, including those of a treating source.  Instead, each opinion or prior finding is evaluated by considering the factors set forth in § 1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of treatment relationship and examining relationship; (4) specialization, and (5) other factors, such as familiarity with the other evidence in the claim or an understanding of  the program's policies and evidentiary requirements. Of these factors, the most important are supportability and consistency.

In the case at bar, the undersigned notes that Dr. Bauer, who had no treatment relationship with the Plaintiff, did not state that the Plaintiff could not function in an environment where greater than limited interpersonal demands were placed upon her, but instead described the conditions in which she would work best. Moreover, Dr.

Grand, the other non-examining state agency psychologist, opined that the Plaintiff had <u>no</u> limitations in the area of social interaction, and Dr. Sadhai, the consultative examiner, found that the Plaintiff's social functioning was moderate to good. Under these circumstances, the ALJ was not required to highlight and/or incorporate Dr. Bauer's opinion on the Plaintiff's ability to respond to interpersonal demands.

## B. <u>Evaluation of the Plaintiff's Knee Impairment</u>

Next, the Plaintiff contends that the ALJ erred by failing to designate her knee impairment as severe and to incorporate its resulting limitations into the residual functional capacity assessment. In response, the Commissioner first notes that as long as an ALJ finds at least one severe impairment at step two of the sequential evaluation, requiring the ALJ to proceed to step three, the ALJ is not required to identify every severe impairment. <u>Hearn v. Comm'r Soc. Sec. Admin.</u>, 619 F. App'x 892, 895 (11th Cir. 2015) (citing <u>Jamison v. Bowen</u>, 814 F.2d 585, 588 (11th Cir. 1987)); <u>Tuggerson-Brown v. Comm'r of Soc. Sec.</u>, 572 F. App'x 949, 951-52 (11th Cir. 2014). However, at later stages in the process, the ALJ is required to consider the effect of each of a claimant's impairments, regardless of severity. <u>Id.</u> at 951. Accordingly, this Court need not address the issue of whether the Plaintiff's knee impairment was severe or non-severe.

As to whether the ALJ was required to include the Plaintiff's knee impairment as a limitation in the residual functional capacity assessment of the Plaintiff and the hypothetical posed to the VE, the ALJ noted that the Plaintiff had complained of left knee pain on October 3, 2018, but examination revealed normal gait and normal range of motion in that knee, with no swelling. On March 18, 2019, the Plaintiff's gait and coordination also were normal. The ALJ pointed out that the Plaintiff again complained of left knee pain on May 16, 2019, and while examination revealed

decreased range of motion, there was no swelling, effusion, ecchymosis or erythema. On June 5, 2019, the Plaintiff had no edema and exhibited normal range of motion throughout her musculoskeletal system, with similar findings on June 6, June 7 and July 10, 2019.

The undersigned notes that at the administrative hearing, the Plaintiff was unsure which of her knees was receiving the most medical attention. Considering the record as a whole, the undersigned finds that the ALJ's decision not to include limitations based on left knee pain in the residual functional capacity assessment of the Plaintiff  and the hypothetical presented to the VE was supported by substantial evidence in the record and was not error.

## C. Evaluation of the Plaintiff's Fibromyalgia

The Plaintiff next asserts that the ALJ failed to properly assess the limitations imposed by her fibromyalgia, as required by SSR 12-2p, which deals with the evaluation of this condition.  The Plaintiff points to the portion of that ruling which states:

> If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms. As we explain in SSR 96-7p, we will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning.

Here, the ALJ specifically found that the Plaintiff had the severe impairment of fibromyalgia, but pointed out that the  mere diagnosis of a severe impairment such as this does not automatically equate to a finding of disability.  As stated by the Eleventh Circuit in Laurey v. Comm'r of Soc. Sec., 632 F. Appx. 978, 988 n. 5 (11th Cir. 2015), "The mere fact that the ALJ determined that Laurey's fibromyalgia was a

'severe impairment' . . . does not mean that the ALJ was required to attribute severe pain to her fibromyalgia."

The ALJ noted that on June 26, 2018, three weeks prior to Dr. Edouard's fibromyalgia diagnosis, the Plaintiff reported that she was negative for joint pain, myalgias and headaches. Treatment notes from May 17, 2018 revealed that the Plaintiff was in no distress and there were no remarkable musculoskeletal or neurological findings. The Plaintiff reported improvement with the Botox injections and that she was coping better with chronic pain, and Dr. Blaya noted that she was happy to see the Plaintiff doing so well. Similarly, the results of Dr. Edouard's consultative physical examination of the Plaintiff did not support the Plaintiff's subjective complaints.

The ALJ also noted on April 3, 2019 the Plaintiff reported that her migraines had improved and her pain was controlled with MS Contin and muscle relaxer. Treatment notes reflected that the Plaintiff's pain syndrome, fibromyalgia, joint pains, migraines, depression and anxiety were currently stable and controlled. Considering the record as a whole, substantial evidence supports the ALJ's evaluation of the Plaintiff's fibromyalgia, and the Plaintiff has failed to show that the ALJ failed to comply with any provision of SSR 12-2p.

### D. Evaluation of the Plaintiff's Migraine Headaches

The Plaintiff next argues that the ALJ erred by failing to consider Social Security Ruling (SSR) 19-4p when evaluating the Plaintiff's migraine headaches. Specifically, the ALJ did not address whether the Plaintiff's migraine headaches equaled listing 11.02 (epilepsy) and did not account for how the Plaintiff's headaches were incorporated into the ALJ's residual functional capacity and the hypothetical

presented to the VE.  SSR 19-4p deals with the determination of whether a primary

headache disorder (including migraine) meets or equals a listing, and states:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.

> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.[2]

---

[2] The SSR provides specific criteria for determining whether headaches meet or equal this listing:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p goes on to state, "If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's residual functional capacity (RFC). We must consider and discuss the limiting effects of all impairments and any related symptoms. . . ."

In the instant case, the ALJ noted that there is no listing section specific to the evaluation of migraine headaches, and found that the Plaintiff's impairment did not medically equal the criteria of any listing section in Neurological, section 11.00, et seq. As to the effects of the Plaintiff's headaches, the ALJ provided throughout her decision examples of statements by the Plaintiff that her migraines were controlled by the medication she was taking, and of treatment notes also reflecting that the Plaintiff's migraines were controlled.

The ALJ also summarized the medical evidence of this impairment, pointing out that the MRI of the Plaintiff's brain was unremarkable except for an indication of sinus disease. In March 2018, the Plaintiff stated that Botox injections brought some relief and Toradol injections had been helpful in the past. Additionally, the Plaintiff attributed her symptoms to external stressors, including family issues and job loss. At that time, the Plaintiff denied experiencing any dizziness, tingling, tremors, sensory change, speech change, focal weakness, seizures or loss of consciousness, and neurological examination showed that the Plaintiff retained normal reflexes, gait and coordination.

The undersigned finds that the ALJ fully complied with the requirements of SSR 19-4p in finding that the Plaintiff's migraine headaches did not meet or equal a listed impairment and that her headaches did not limit her residual functional capacity

beyond the assessment made by the ALJ and presented in hypothetical posed to the VE.

### E. Failure to Develop the Record

The Plaintiff's final asserted ground for relief is that the ALJ erred by failing to fully and fairly develop the record when she did not admit and exhibit all of the Plaintiff's medical evidence. The Plaintiff notes that the medical records portion of the administrative record contains exhibits marked B1F-B22F, but the ALJ made reference in her decision to an Exhibit designated B23F. The Plaintiff argues that it was reversible error for the ALJ to fail to admit into evidence the records designated B23F and include those documents in the administrative record.

The Plaintiff relies on the Commissioner's Hearings, Appeals and Litigation Law Manual (HALLEX) § I-2-1-20(B)(1), which states that "[i]f an ALJ receives additional evidence at or after a hearing that he or she intends to add to the record, [hearing office] staff will make the information with the next exhibit number." The Plaintiff also quotes HALLEX § I-2-1-20(B)(3) which states, "[t]he claimant is entitled to know the information the ALJ relied on when making the decision. When an ALJ issues a less than favorable decision, preparing the exhibit list in final form is mandatory and is not a discretionary practice."

The Commissioner responds that while the ALJ has an obligation to develop a full and fair record, a plaintiff must demonstrate prejudice resulting from the ALJ's failure to do so before remand is required. See, Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997). The Commissioner states that the medical records to which the ALJ referred as Exhibit B23F are August 2019 records from Memorial Healthcare, which are contained in the record at R:31-141. References in the ALJ's decision to Exhibit B23F are consistent with this statement by the Commissioner. The Commissioner also

points out that there is no case in this Circuit which holds that the HALLEX has the force of law, is binding on the Commissioner or is subject to judicial review.  The Eleventh Circuit <u>has</u> stated that assuming that a HALLEX provision has the force of law is "a very big assumption."  <u>George v. Astrue</u>, 338 F. App'x 803, 805 (11th Cir. 2009).

The Plaintiff also suggests that the ALJ was required to develop the record by obtaining the results of the MRI of the Plaintiff's left knee.  As the Commissioner points out, the Plaintiff did not seek to supplement the record by including this report and there is no indication that its inclusion would change the result of the ALJ's decision (or even that it exists).

The undersigned concludes that the ALJ committed no error requiring remand by failing to admit and mark as an exhibit additional documents or failing to obtain the results of the MRI of the Plaintiff's left knee.  Accordingly, the Plaintiff has failed to demonstrate any ground for reversal or remand of the ALJ's decision, which is supported by substantial evidence in the record.

## VI. <u>CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Amended Motion for Summary Judgment (ECF No. 31) be DENIED and the Commissioner's Cross Motion for Summary Judgment (ECF No. 27) be GRANTED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.

Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 31st day of August, 2021.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record